UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JORGE ISAEL NOLLA,

    Petitioner,

             Case No. 22-cv-1224-pp

  v.

ROSA ALBINA RODRIGUEZ VARGAS,

    Respondent.

**ORDER DENYING PETITION FOR RETURN OF CHILD TO MEXICO
AND DISMISSING CASE**

   The week of April 28, 2024, the court conducted an evidentiary hearing on Jorge Isael Nolla's petition for return of the parties' child to Mexico under the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (Oct. 25, 1980) (the "Hague Convention") implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §9001 *et seq.* This order contains the court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a). See also Khan v. Fatima, 680 F.3d 781, 785 (7th Cir. 2012) ("the trier of fact must decide whom to believe (and how much to believe) on the basis of coherence and plausibility of the contestants' testimony, corroboration or contradiction by other witnesses, and other clues to falsity and veracity.") Based on these findings, the court denies the petition.

1

## I. Procedural History

Petitions for the return of children are time sensitive. Article 2 of the Convention directs that signatories "use the most expeditious proceedings available." That did not happen in this case for a variety of reasons. The petitioner filed his verified complaint and petition for issuance of a show cause order and for return of child to Mexico on October 18, 2022. Dkt. No. 1. The respondent filed an answer on December 7, 2022 and the parties filed their joint Rule 26(f) plan on January 5, 2023. Dkt. No. 10. The next day, the court issued a scheduling order based on the parties' Rule 26(f) plan, set a discovery deadline of March 17, 2023 and calendared a status conference for April 11, 2023. Dkt. No. 11.

The court expected that at the April 11, 2023 status conference, the parties would be ready to schedule the evidentiary hearing. During the status conference, however, the court learned that there were issues with discovery. The petitioner told the court that there may need to be additional depositions; the respondent said she had not received all of the documents she had requested from the petitioner. Dkt. No. 15. The court ordered the parties to complete the exchange of documents and taking of depositions by the end of the day on May 19, 2023. Id. at 1. The court also calendared a pre-evidentiary hearing conference for July 12, 2023 and a five-day evidentiary hearing for July 31, 2023. Id. It issued a separate, pre-hearing order requiring the parties to file a report by July 5, 2023, identifying the summary of the claims; statement of the issues; anticipated length of the hearing; any stipulations

2

reached; name, occupation and city of residence of each witness; a short narrative statement about the qualifications of any experts; a complete list of all exhibits; a designation of depositions; a proposed verdict form; and a statement regarding whether the parties were requesting a court reporter. Dkt. No. 16. On May 4, 2023, the court approved the parties' stipulated motion to allow the parties to conduct depositions using remote means. Dkt. No. 18.

Several weeks later, the petitioner moved to extend the "document discovery" deadline, claiming that new information "regarding documents in the [respondent's] possession became known" to the petitioner in the respondent's deposition. Dkt. No. 19. The court denied the motion without prejudice because the petitioner did not cite a rule in support of the motion, the motion did not state how much additional time the petitioner was seeking or otherwise identify the "new information," and it appeared that the respondent had produced information known to the petitioner long before the deposition. Dkt. No. 25.

At the July 12, 2023 hearing, the court expressed doubt that the case would be ready for the evidentiary hearing on July 31, 2023. Dkt. No. 35. It had become apparent to the court that some of the witnesses would require interpreters and the court observed that there is no federal statute providing for court-appointed interpreters in civil cases. Id. at 1. The court shared its research regarding interpreters, notifying the parties of 22 U.S.C. §9007 and 28 U.S.C. §1827(g)(4). The court also expressed concern about the lack of stipulations and the number of witnesses and exhibits on the parties'

3

respective lists. Id. After hearing argument on the parties' motions *in limine*, the court converted the July 31, 2023 evidentiary hearing to an in-person status conference. Dkt. No. 35.

At the July 31, 2023 status conference, the court ruled on the petitioner's motion to amend/correct the complaint to change the date of abandonment from August 14, 2021 to December of 2021. Dkt. No. 45 at 1. The court held that allowing the petitioner to amend eight months after the filing of the petition in what was supposed to be an expedited proceeding would prejudice the respondent. Id. at 2. It questioned the petitioner's argument that he needed to amend the petition to conform to the respondent's testimony and his assertion that Fed. Rule Civ. P. 15(b) allows amendments based on objections at trial; the court pointed out that no trial—or evidentiary hearing— had taken place. Id. The court observed that the petitioner had made this request only after the respondent had raised as a defense the question of whether the petition was timely filed. Id. The court also denied the respondent's request to preclude the petitioner from referencing in any argument any date other than August 14, 2021, emphasizing that the petitioner had the right to respond to any defenses raised by the respondent. Id.

During the hearing, the court informed the parties that the petitioner would bear the costs of the interpreter unless and until the court issued a ruling in favor of the petitioner (at which time the court could decide whether to shift some or all of the costs to the respondent). Dkt. No. 45 at 2. The parties said they had begun discussing stipulations and the respondent's attorney

4

anticipated that she could pare down the witness lists. Id. The court granted the petitioner's motion *in limine* to exclude experts not previously disclosed but told the parties that that ruling applied to both the petitioner and respondent. Id. at 3. The court ruled that the petitioner could not call Attorney Rhode Abigail Villa Lopez because the petitioner had not disclosed her as an expert. Id. at 3. The court set deadlines for stipulations, and, among other things, ordered the parties to exchange English translations of any documents they planned to use by September 22, 2023. Id. at 4.

On September 12, 2023, the court ordered that by October 27, 2023, the petitioner must deposit with the Clerk of Court $6,325.05 to cover the cost of two interpreters at the government rate of $566 per interpreter per day (plus parking and mileage). Dkt. No. 49. The court explained that the funds would be deposited into the court's account and that if the court found in favor of the petitioner, the court would give the parties an opportunity to present argument about shifting some or all the costs to the respondent. Id. at 2.

When the respondent filed her witness list on October 25, 2023, the court discovered that nine witnesses required a Spanish interpreter. Dkt. No. 54. The court contacted the interpreters and learned that only one would be available for the whole week. At the October 30, 2023 pre-hearing conference, the court expressed concern regarding whether there would be enough interpreters, the technology that would be necessary to accommodate the witnesses (not yet identified) who would require simultaneous interpretation, the unresolved objections to the translations proffered by the petitioner, a new

motion from the petitioner to strike the respondent's *errata* sheet and the petitioner's failure to deposit funds for the interpreters by the deadline the court had set. Dkt. No. 58. During the hearing, the petitioner expressed surprise when the respondent said she might be willing to stipulate to certain facts (such as the fact that the parties owned property together). Id. at 3. Because it was apparent that the parties had not been working together, the court ordered them to meet and confer regrading stipulations. Id. The court also provided an overview of the parties' burdens, including the affirmative defenses. Id. The court scheduled another hearing for November 9, 2023. Id.

At the November 9 hearing, the court addressed the petitioner's failure to comply with the court's order to deposit interpreter funds by October 27, 2023; the petitioner had not deposited the funds until November 1, 2023 and then had failed to pay by check as ordered. Dkt. No. 65 at 2. The court identified problems with some of the translated exhibits the petitioner had provided the respondent, observing that they obviously were incomplete. Id. The court set a new deadline for the parties to file findings of fact and conclusions of law and moved the evidentiary hearing date to April 29, 2024. Id. The court ordered that by March 1, 2024, the parties must advise the court of the exhibits they intended to use at the hearing. Id. The court ordered that all stipulations be filed by April 16, 2024, along with the parties' final witness lists and proposed findings. Id. at 3. Additional issues arose leading up to and during the evidentiary hearing that the court will explain below.

For these reasons, the court did not conduct an "expedited" hearing.

6

## II.   Evidentiary Hearing Standards

During the evidentiary hearing, the court applied the Federal Rules of Evidence consistent with the practice of other courts. See e.g., Schwartz v. Hinnendael, Case No. 20-cv-1028, 2020 WL 5531564, at *2 (E.D. Wis. Sept. 15, 2020) (determining in a Hague Convention case whether expert was admissible under Federal Rule of Evidence 702); Luedtke v. Luedtke-Thomsen, Case No. 12-cv-750-WTL-TAB, 2012 WL 2562405, at * 1 (S.D. Ind. June 29, 2012) (stating that Federal Rules of Evidence apply to petition hearings).

The parties asked the court to admit several exhibits which were not accompanied by any witness testimony. The court told the parties that the court would consider the exhibits that the parties identified and discussed during the hearing, but that they should not anticipate that the court would sift through voluminous documents not discussed at the hearing to determine whether those documents had some bearing on the issues in contention. On the first day of the evidentiary hearing, the court reiterated this:

> So I am going to admit the exhibit but—and just for everyone's information, this goes for every exhibit in this trial, if it's a multipage voluminous exhibit, les[t] you be suffering under the delusion that I am going to go back there with my staff and go through every page of everything to figure out what's in there, that's not going to happen. I will reference what has explicitly been pointed out here in court. So I will admit Exhibit 1 on that basis . . . – 81, sorry, and also exhibit 82, which is the Spanish—as I understand it Spanish version of the English translations.[1]

---

[1] Tr. 4/29/24 at p. 147. The court had access to a rough draft of the hearing transcript. If either party would like to order a final version of the transcript, the procedure for doing so can be found on the court's website at www.wied.uscourts.gov.

The court did not require the parties to authenticate documents. Section §9005 provides that any documents submitted with a petition seeking relief under the Hague Convention or any documents "provided after" the petition's submission which "relate to" the petition require no authentication to be admissible in court. 22 U.S.C. §9005. Courts in this circuit have allowed foreign custody court documents and excerpts of foreign law to be admitted without being authenticated. See, e.g., Ho v. Ho, Case No. 20-cv-6681, 2021 WL 2915161, *2 (N.D. Ill. July 12, 2021).

## III. Respondent's Motion under Rule 52(c)

At the close of the case in chief, the respondent moved under Rule 52(c) for a judgment that the petitioner had not established that the removal date was anything other than August 14, 2021 and that the petitioner had failed to make a *prima facie* case.[2] She argued that the petitioner had failed to present any evidence regarding custody rights in Mexico.[3] The petitioner responded that on August 18, 2022, the Racine County Circuit Court had deferred jurisdiction in the divorce and custody proceedings to the Mexican court and that the Mexican judge (who appeared by Zoom during that hearing) had determined that Mexico has personal jurisdiction over the respondent.[4]

As the court will explain in more detail below, it found that the date of removal was August 14, 2021.[5] The court denied the respondent's motion

---

[2] Tr. 5/1/24 at p. 16.
[3] Id. at p. 17.
[4] Id. at p. 20.
[5] Id. at p. 32.

8

without prejudice as to all other arguments and asked the respondent to present her evidence.

## IV.   Format of the Evidentiary Hearing

The court told the parties that they would have one week to present their evidence. During the July 31, 2023 status conference, the court proposed the idea of bifurcating the evidentiary hearing, first addressing the issues on which the petitioner bore the burden of proof and then, if necessary, addressing the affirmative defenses. Dkt. No. 45. The parties asked for time to discuss the idea with their clients; the court agreed, asking the parties to provide their responses by August 4, 2023. Id. at 3.  The respondent did not object to bifurcation but suggested that the court consider stipulated documentation and briefing from the parties to cut down on hearing time and expense. Dkt. No. 46. The petitioner objected to bifurcation and opposed further briefing. Dkt. No. 47. During the October 30, 2023 hearing, the court told the parties that it would not bifurcate the hearing. Dkt. Nos. 56-58.

In light of the issues with arranging for interpreters and the petitioner's failure to comply with the court's September 12, 2023 order requiring him to deposit the funds for the interpreter, the court rescheduled the evidentiary hearing for the week of April 29, 2024. Dkt. No. 65. Again, the court informed the parties during the final pre-hearing conference that they had one week in which to present their evidence. Dkt. No. 81. The court reminded the parties of this fact throughout the evidentiary hearing.

9

The hearing began on Monday, April 29, 2024. At the end of the day on Thursday, May 2, 2024, the respondent had not presented her evidence on the affirmative defenses, other than the few witnesses who had appeared by Zoom (whom the court allowed respondent's counsel to take out of order) and the stipulations of the parties. Late in the day, while the court was ruling on an objection during the petitioner's cross-examination of the respondent, the respondent's attorney asserted that the court had agreed to first hear all the evidence on the petitioner's *prima facie* case and to issue an oral ruling regarding whether the petitioner had made that case before the respondent presented any evidence in support of her affirmative defenses. Dkt. No. 86. The court stated that it did not recall making such a ruling; in fact, it recalled ruling that it would not bifurcate the evidentiary hearing. Id. at 2.

On the morning of May 3, 2024, the court explained that it had spent the evening reviewing the docket and a rough draft of the transcript of the hearing thus far. Dkt. No. 88 at 2. The court read a portion of the transcript out loud, pointing out that it was the *respondent's attorney*—not the court—who mentioned bifurcation before calling her witnesses who would appear by Zoom. Id. The court had agreed to her request to give her leave to inquire about the affirmative defenses with the understanding that the petitioner could always argue that the court should disregard the testimony.[6] After reading that portion of the transcript, the court expressed frustration, stating that this type of miscommunication had been symptomatic of the litigation, with the parties

---

[6] Tr. 5/1/24 at p. 2.

failing to communicate with each other, talking past each other and reading into the court's rulings statements that the court had not made. Id. The court allowed petitioner's counsel to cross-examine the respondent but reminded him that he could not use his cross-examination to elicit testimony to support his case-in-chief. Id. At that point, the petitioner already had rested—twice. Id.

By the end of the week, the parties had presented evidence related to the petitioner's case in chief but the respondent had not presented all of her evidence on affirmative defenses. The court explained that it could not extend the hearing into the next week because it was starting a jury trial in another case. For that reason, the court told the respondent that she could finish with her evidence regarding habitual residence and the court set would set another date, if necessary, for a one-day hearing on affirmative defenses. Id.

## V.     Findings of Fact

The court's findings of fact are based on the testimony and the evidence in the record upon which the parties relied during the hearing. The court has not considered the arguments of the parties and proposed findings that were not supported by evidence during the hearing.

The petitioner, who was born in Puerto Rico, moved to the mainland when he was seventeen, joined the Marine Corps, lived in Racine, Wisconsin and Illinois and re-enlisted for Navy Seal training.[7] He attended the Polytechnic University of Puerto Rico and Northern Illinois University.[8] The petitioner has

---

[7] Tr. 4/29/24 at p. 37-38.
[8] Id. at p. 39.

four children; the oldest attends college in the United States and the second oldest lives with him in Mexico.[9] His child with the respondent currently lives in the United States. His youngest child lives in Mexico. The petitioner received a permanent Mexico residency card in 2020.[10]

The petitioner started a company, Fispe, Inc., which he registered in Wisconsin.[11] He started another company—Fispy, S. de R.L. de C.V. in Mexico—in 2018 in the town of Escuinapa, state of Sinaloa,[12] and he applied for a permanent resident card in Mexico that same year.[13] He received his permanent residence card from Mexico "some time or after COVID in 2020."[14] The petitioner explained that he couldn't open the Mexican company if he wasn't a permanent resident of Mexico so he took the approach of starting the Wisconsin corporation first.[15] He received a telecommunications license from Mexico on August 3, 2018.[16] The petitioner testified that he administratively dissolved the Wisconsin corporation on December 9, 2019.[17] According to the petitioner, it always was his plan to have the company in Mexico.[18] He testified that he "started a company in Mexico around 2016" and that most of his time was spent in Mexico."[19] He last paid taxes in the United States in 2019 even

---

[9] Id.
[10] Exs. 5, 59.
[11] Tr. 4/29/24 at p. 43.
[12] Ex. 64.
[13] Tr. 4/29/24 at p. 57.
[14] Id. at p. 56; Ex. 5.
[15] Tr. 4/29/24 at p. 47.
[16] Ex. 60.
[17] Tr. 4/29/24 at p. 189-90; Ex. 61.
[18] Id. at p. 46.
[19] Id. at p. 42.

though he lived in the United States through April of 2021.[20] The petitioner testified that he has paid taxes in Mexico on a monthly basis since 2019.[21]

The petitioner testified that Fispy had property and cars in Mexico;[22] the petitioner proffered exhibits establishing that Fispy paid electrical, insurance and other bills beginning in 2018,[23] and had a bank account at BBVA.[24] The petitioner clarified that Fispy did not do business in the United States,[25] and that the respondent was not involved with the petitioner's businesses.[26] The respondent similarly testified that she had no intention of creating a company called Fispy in Mexico.[27] Currently, the petitioner is the general manager of Fispy and resides in Mexico, in the state of Sinaloa.[28]

The respondent is a Mexican citizen, a permanent resident of the United States since February 21, 2018; she holds a valid Permanent Resident Card for the United States.[29] Her Mexican Voter's Registration card—issued in 2013— expired in 2023; the address listed on that card was C. Damasco Murua 103 Col Centro 8240, Esquinapa Sin[aloa].[30] The respondent currently resides at

---

[20] Id. at p. 70.
[21] Id. at 71.
[22] Id. at p. 73; Ex. 39
[23] Exs. 40, 42-48, 62.
[24] Ex. 29.
[25] Tr. 4/29/24 at p. 47.
[26] Id. at pp. 187-88.
[27] Tr. 5/2/24 at p. 43.
[28] Tr. 4/29/24 at pp. 39-40, 186.
[29] Dkt. No. 82 at ¶2; Ex. 6.
[30] Dkt. No. 82 at ¶4.

127 South Memorial Drive in Racine, where she has lived with her youngest son, N.D.N., since August of 2021.[31]

The parties met in Mexico City in 2014; the petitioner was a client in the club where the respondent worked.[32] The respondent traveled between Mexico City and Sinoloa for work and to see her son from a prior relationship who lived with her mother (and for whom the respondent provided financially).[33] The respondent testified that the petitioner offered her money to live in an apartment and "be with him" whenever he traveled to Mexico for work; she accepted his offer in April of 2014.[34] The respondent explained that she accepted this transactional offer because, instead of having to tolerate ten different men, she would have to tolerate "just one."[35] She testified that the arrangement was perfect; she could spend more time with her son and her family, the petitioner always deposited the money as they agreed and she no longer had to risk her life.[36] She would sometimes travel with the petitioner, but she did not know he was married to a woman in Wisconsin.[37]

By the time the petitioner's work contract in Mexico had ended, around November of 2014, the respondent felt their relationship had become romantic.[38] The respondent admitted that she didn't know whether the

---

[31] Tr. 5/1/24 at p. 155.
[32] Tr. 4/29/24 at p. 92; Tr. 5/1/24 at p. 156.
[33] Tr. 5/1/24 at p. 82.
[34] Id. at p. 156-57.
[35] Tr. 5/1/24 at p. 158.
[36] Id.
[37] Id.
[38] Id.

Case 2:22-cv-01224-PP   Filed 06/13/24   Page 14 of 69   Document 90

petitioner had the same view of their relationship; because he continued to deposit the money, she testified that it may have been a "business deal."[39] The respondent received a tourist visa for the United States after the petitioner applied on her behalf.[40] According to the respondent, the couple were making plans to move to the United States and the petitioner had rented a house for them.[41] It was the respondent's understanding that she would stay in the United States if she liked it.[42] She testified that she intended to move to the United States permanently.[43] She knew, however, that because she was on a tourist visa, she couldn't stay in the United States for more than six months at a time.[44]

The respondent testified that in the first few months of 2015, she learned that the petitioner was fighting for custody of his sons but she still didn't know he was married.[45] The petitioner and respondent had a religious wedding ceremony in November of 2015 but they did not legally marry until May 6, 2016; they married in Escuinapa, Mexico.[46] The petitioner testified that they got married in Mexico because they were going to be living in Mexico.[47]

---

[39] Id.
[40] Id. at pp. 159, 160.
[41] Id.
[42] Id.
[43] Id.
[44] Id. at p. 161.
[45] Tr. 5/1/24 at p. 161.
[46] Ex. 1l; Tr. 5/1/24 at pp. 162-63; Ex. 1.
[47] Tr. 4/29/24 at p. 92.

15

The respondent testified that, prior to her marriage, she had some money saved.[48] She said that the petitioner told her to build in Mexico because there were no taxes and then she would always have a house.[49] She testified that she purchased a property in Escuinapa with her money.[50] According to the respondent, she made the purchase as an inheritance for her older son and with the hope of returning to Mexico later in life (around seventy or eighty years old).[51] Meanwhile, the petitioner testified that the couple acquired the property in 2016 because the respondent wanted a baby and they would need a house for him.[52] He testified that they had to hire a lot of people to tear down the building already on the property and build a rather large property for their son; he testified that he paid for the construction.[53] Although the petitioner testified that the respondent and other family members lived at the house, he provided no time frame and testified as to their family visiting the property only over Christmas and New Year's in 2017/2018 when the construction was complete.[54] The petitioner testified that there was another property they purchased under the respondent's name because the petitioner did not have a permanent residence in Mexico.[55] Fispy covered utility bills for one or both of the properties in 2020.[56]

---

[48] Tr. 5/1/24 at p. 162.
[49] Id. at p. 162.
[50] Id.
[51] Id. at p. 162-63.
[52] Tr. 4/29/24 at p. 52.
[53] Id. at p. 53.
[54] Tr. 4/29/24 at p. 54.
[55] Id. at p. 55-56; Ex. 32.
[56] Ex. 49.

Although the petitioner testified that the couple got married in Mexico on May 6, 2016 because they were going to live in Mexico and that they wanted a house in Mexico for their baby, he also testified that they traveled to the United States in June or July of 2016 because they wanted to move before the respondent's pregnancy was showing.[57] The petitioner explained that, "if she would show, then immigration would not allow her in because she didn't have legal status in the United States."[58] The petitioner testified that he wanted their child to be a United States citizen.[59] When asked whether, in his application for permanent residence on behalf of the respondent, he represented that the respondent had entered the United States on May 9, 2016, the petitioner said that he was not sure of and couldn't recollect the dates.[60]

The petitioner was present for the birth of the parties' child, N.D.N., on September 28, 2016 in Kenosha, Wisconsin and is listed on the birth certificate as the father.[61] On July 31, 2017, the parties filed a petition for permanent residence in the United States for the respondent.[62] The petitioner testified that they applied for a permanent resident card because the respondent planned to stay for a longer period of time.[63] He testified that the plan was to return to

---

[57] Tr. 4/30/24 at p. 3.
[58] Tr. 4/29/24 at p. 49; Tr. 4/30/24 at p. 4.
[59] Tr. 4/30/24 at p. 4.
[60] Id. at p. 6.
[61] Dkt. No. 82 at ¶8; Ex. 11.
[62] Tr. 4/29/24 at p. 97; Tr. 4/30/24 at p. 4-5.
[63] Tr. 4/29/24 at p. 97.

Case 2:22-cv-01224-PP   Filed 06/13/24   Page 17 of 69   Document 90

Mexico in 2019 but that plans were delayed by Hurricane Willa and COVID-19.[64]

After N.D.N.'s birth, he lived with the petitioner, the respondent and his brothers in Racine, Wisconsin.[65] The respondent said that the petitioner was travelling a lot and would "come and go" at the house.[66] The respondent testified that N.D.N. socialized with her, his brothers and people from the church.[67] There were gatherings at the church on Sundays and at other times for events.[68] She testified that N.D.N. was socializing with children regularly.[69] The petitioner's stepmother and her family lived in the area and the respondent considered this side of the family to be N.D.N.'s family.[70] The respondent hosted parties at the church and the whole family would gather there.[71] The respondent continued to attend what is now called the Hope City Church with the petitioner's extended family.[72] When N.D.N. was not involved in activities the community, he was at home with the respondent and his brothers.[73]

The respondent called Dallyann Escobar to testify. Ms. Escobar has known the petitioner for "20 something years."[74] She first met the petitioner in Puerto Rico and again while she was visiting her aunt, the petitioner's

---

[64] Tr. 4/29/24 at p. 98.
[65] Tr. 5/1/24 at p. 166.
[66] Id. at p. 166-67.
[67] Id. at p. 167.
[68] Id. at p. 168.
[69] Id. at p. 169.
[70] Id. at p. 169-70.
[71] Id. at p. 170.
[72] Tr. 5/1/24 at p. 170.
[73] Id. at p. 171.
[74] Id. at p. 123.

stepmother, in Madison, Wisconsin.[75] The petitioner's stepmother now splits her time between Texas and Racine, Wisconsin.[76] Escobar testified that she met the respondent through her cousin, either before or while the respondent was pregnant with N.D.N.[77] Escobar went to N.D.N.'s birthday and saw him "often."[78] Escobar testified that her daughter is about the same age as N.D.N. and they were—and are—friends.[79] Her daughter and N.D.N. were "happy when they see each other."[80] Escobar thinks of N.D.N. "like [her] nephew.[81] Escobar testified that the respondent and N.D.N. are involved with the church, family gatherings and the community.[82] Escobar did not have contact with the respondent or N.D.N. while they were in Mexico between April and August of 2021.[83]

In addition to having family and church ties, N.D.N. has seen the same pediatrician—Dr. Rebecca Lescher at the Aurora Health Hospital—from birth to the present.[84] Around his second birthday, the respondent became concerned that N.D.N. wasn't talking, was crying a lot and that he was hitting things.[85] Dr. Lescher shared the respondent's concerns and ordered testing.[86] The

---

[75] Id.
[76] Id. at p. 124.
[77] Id.
[78] Id. at p. 125.
[79] Id. at pp. 125-126.
[80] Id. at p. 132.
[81] Id. at p. 129.
[82] Id. at pp. 135-38.
[83] Id. at p. 141.
[84] Tr. 5/1/24 at p. 173.
[85] Id. at pp. 172, 178.
[86] Id. at p. 172.

respondent testified that the petitioner opposed further testing because he believed that (1) N.D.N. was confused by hearing both English and Spanish; and (2) his behavior was simply "hyperactive."[87]

Because of his age, N.D.N. didn't attend school in Racine but he attended day care on a daily basis.[88] He attended day care at Christ Church between January 8, 2019 and the start of the pandemic in March of 2020.[89] The respondent testified that he made friends with the other children at the day care and was very affectionate with them.[90]

N.D.N. was referred to the Birth-to-Three program through the Racine Unified School District based on his developmental delays.[91] An assessment revealed that at the beginning of 2019, the Early Childhood Teacher evaluation scored N.D.N. at a twelve-month level for adaptive skills, a 10-13 month level for personal social skills, and a 13-16 month level for cognitive skills.[92] The records establish that N.D.N. required constant supervision.[93] The respondent agreed to services; she said that therapists from Birth-to-Three visited three times per week.[94] N.D.N. received regular medical care and individualized plans for services under the Birth-to-Three program.[95] The respondent testified that the Birth-to-Three program recommended that N.D.N. be evaluated by someone

---

[87] Id. at p. 179; Tr. 5/2/24 at p. 17.
[88] Tr. 5/2/24 at p. 22.
[89] Id. at p. 23.
[90] Id.
[91] Tr. 5/1/24 at p. 179.
[92] Ex. 209 at p. 8.
[93] Ex. 209.
[94] Tr. 5/1/24 at p. 180; Ex. 81 at p. 9.
[95] Tr. 5/2/24 at pp. 12-15, 30.

in neuropsychology because they suspected he had autism.[96] She also testified that she wanted the evaluation because she wanted N.D.N. to go to school in Racine; the petitioner wanted to keep N.D.N. at Christ Church or a Montessori school in Racine.[97] The respondent explained that the petitioner was not involved in the planning for services in the United States.[98] She testified that they did not discuss returning to Mexico in 2016 "much less in 2019 or ever."[99] She testified that the petitioner never suggested before April 14, 2021 that N.D.N. should attend school in Mexico.[100]

The petitioner and respondent offered competing versions of the events leading up to their decision to travel to Mexico in 2021. As mentioned above, the petitioner gave various dates regarding his intent to return to Mexico (as early as 2017 to as late as 2021). The respondent testified that she never agreed to move to Mexico. She testified that discussions of divorce first started in 2018 and the petitioner would tell her that she would be nobody if she left him.[101] According to the respondent, they began talking about a move sometime in 2020 after the petitioner received a large sum of money.[102] She testified that the parties were tired of the cold weather.[103] The petitioner suggested somewhere warm like Texas or Florida, but told the respondent that

---

[96] Id. at p. 16.
[97] Tr. 5/2/24 at pp. 25-26.
[98] Id. at pp. 19, 39.
[99] Tr. 5/2/24 at p. 26.
[100] Tr. 5/2/24 at p. 27.
[101] Tr. 5/3/24 at p. 73.
[102] Tr. 5/2/24 at p. 46.
[103] Id.

some of the best companies were located in Texas and that Texas had good schools.[104] At the time, the petitioner's oldest son was getting ready to go to college and the quality of schools were important.[105] The respondent testified that they talked about N.D.N. attending school in Texas but that the petitioner was specifically looking at schools for his older sons.[106] She said they talked about therapy for N.D.N. in Texas but did not discuss doctors there.[107]

The respondent said that just before they left Racine she and the petitioner discussed going directly to Mexico on vacation to save some money so that they could put down a bigger down payment on the house in Texas.[108] She testified that she agreed to stop in Mexico because it had been some time since she had been there.[109] She said they were going to stay in Mexico while the Racine school classes were online—in other words, to finish the online schooling—and that they would move to Texas when in-person classes resumed.[110] The respondent viewed their time in Mexico as a vacation.

When asked about the move to Texas, the respondent testified that she agreed because the petitioner "made it all sound very nice."[111] The respondent said the petitioner sent her links to homes in Texas from Zillow, including homes in Austin near the petitioner's brother, that were very beautiful and she

---

[104] Id. at pp. 46, 50.
[105] Id. at p. 28.
[106] Id.
[107] Id.
[108] Id. at p. 49.
[109] Id.
[110] Tr. 5/2/24 at pp. 50-51, 69.
[111] Id. at p. 46.

believed that they were going to buy or rent a home once in-person classes resumed.[112] The respondent explained that she did not have records of the communications because, after the respondent returned to the United States in 2021 with N.D.N., the petitioner blocked her iCloud account and cut off her cellular service; she no longer has access to the accounts.[113]

There is no dispute that the parties packed up their home in Racine, Wisconsin and sold their belongings. The petitioner called Francisco Nolla, a resident of Culio, Texas and his half-brother, to testify about the move to Mexico in April 2021.[114] He testified that the petitioner now lives in Guadalajara, Mexico.[115] Francisco Nolla testified that he flew to Racine, Wisconsin in April of 2021 and helped the petitioner and respondent pack their home.[116] This included loading furniture into a trailer. He testified that he helped them pack all of the items in their residence; however, he admitted on cross-examination that he returned to Wisconsin at the end of April to put things in a storage unit at the petitioner's direction.[117] Francisco Nolla testified that they drove seventeen hours to his place in Austin, Texas, then continued to Mexico the next day.[118] He testified that they dropped the respondent and her two sons in Mazatlán with their belongings and continued to Escuinapa

---

[112] Id. at pp. 46, 48.
[113] Id. at p. 47-48.
[114] Tr. 5/1/24 at p. 5-6.
[115] Id. at p. 6.
[116] Id. at p. 7.
[117] Tr. 5/1/24 at p. 11.
[118] Id. at p. 7.

Case 2:22-cv-01224-PP   Filed 06/13/24   Page 23 of 69   Document 90

where the petitioner was moving with his other two boys.[119] He also testified that he believed that they were moving to Mexico.[120] Francisco Nolla admitted that he never had a conversation with the respondent as to whether this was a permanent move.[121]

The petitioner and respondent did not live together in Mexico.[122] The respondent stayed at a rented house at Punta Diamante in Mazatlán, Sinaloa, Mexico from approximately mid-April 2021 until mid-August 2021.[123] The petitioner testified that the respondent had Megacable installed at the rental property—on a monthly contract—during the first week after moving into the rental.[124] He testified that the respondent's sister-in-law cleaned the unit while the respondent was living there.[125] The petitioner gave the respondent an allowance while she was in Mexico—just as he did in the United States—by using a Navy Federal Credit Union debit card (which remained open until at least mid-August 2021).[126]

The petitioner stayed at the parties' house at 10 de Mayo in Escuinapa, Sinaloa, Mexico upon arrival in Mexico in approximately mid-April 2021.[127] The respondent testified that the petitioner would not let her go to the residence in

---

[119] Id. at pp. 7-8.
[120] Id. at p. 9, 12.
[121] Id. at p. 12.
[122] Dkt. No. 82 at ¶10.
[123] Tr. 4/29/24 at pp. 90-91; Ex. 58.
[124] Id. at p. 90; Ex. 58.
[125] Id. at p. 128.
[126] Tr. 4/30/24 at p. 24-25.
[127] Dkt. No. 82 at ¶12.

Escuinapa where he was staying—even though she owned the house.[128] Fispy continued to pay the utilities at the property even after the respondent left for the United States.[129]

In his proposed findings of fact, the petitioner represented that he saw N.D.N. "on a daily basis between April 2021 and August 14, 2021."[130] During the hearing, however, the petitioner did not testify that he saw N.D.N. on a daily basis. In fact, he stipulated to the fact that he was staying sixty miles away from N.D.N.,[131] and that he had "regular parenting time" every weekend—which at some point became every other weekend.[132] The respondent testified that the petitioner saw N.D.N. "a couple of times."[133] In support of his position, the petitioner proffered a picture of N.D.N. going through the things in the house in Escuinapa on April 17, 2021.[134]

The petitioner testified that N.D.N. started speech therapy in Mexico in April of 2021 at Ricon De el Habla and received interventions for autism at CEAL in Mexico.[135] The respondent testified that N.D.N. attended speech therapy three times a week but that it didn't always occur because N.D.N. didn't always want to go inside and sometimes the teacher would tell her to come pick up N.D.N. because he was crying.[136] The therapy ended in July

---

[128] Tr. 5/2/24 at p. 67.
[129] Exs. 51, 52.
[130] Dkt. No. 77 at ¶16.
[131] Dkt. No. 82 at ¶13.
[132] Tr. 5/3/24 at p. 90; Tr. 4/29/24 at p. 151-52.
[133] Tr. 4/30/24 at p. 130.
[134] Ex. 81 at p. 382.
[135] Tr. 4/29/24 at p. 121-22; Tr. 4/30/24 at p. 79-80.
[136] Tr. 5/2/24 at p. 70.

because the COVID numbers started to increase.[137] The petitioner referred to a text message from May of 2021 in which the respondent said that they needed to enroll N.D.N. in a school and he explained that enrollment was necessary for attendance in the fall of 2021.[138] He testified that he spoke with a Montessori school teacher around June 22, 2021.[139]

The respondent testified that she spoke with the petitioner in March of 2021 about putting N.D.N. in therapy or something in Mexico so that "all of that time would not go to waste."[140] The respondent testified that they did not discuss N.D.N. attending permanent therapy in Mexico because they were going there on vacation.[141] The respondent emphasized that they were only going to Mexico until the schools in Texas reopened.[142] She said that she didn't fill out the enrollment paperwork in April for N.D.N. to attend schools in the United States, but explained that everything was closed because of COVID.[143]

While the petitioner made it sound like N.D.N. spent significant time with family in Mexico, the respondent testified that N.D.N. saw her sister's children a "couple of times," her nephews "a few times" and a neighbor named Allisa or Elissa, who he saw at the pool.[144] Between April and August of 2021, the

---

[137] Id.
[138] Tr. 4/29/24 at p. 132-33.
[139] Id. at 140-41.
[140] Tr. 5/2/24 at p. 27.
[141] Id. at 28.
[142] Id.; Tr. 5/3/24 at p. 20.
[143] Tr. 5/3/24 at p. 21-22.
[144] Tr. 4/30/24 at pp. 119-122; Tr. 5/2/24 at p. 73.

respondent said that N.D.N. saw his grandmother "a couple of times" and his grandfather twice.[145]

With respect to holidays, the petitioner submitted a proposed finding of fact that N.D.N. "participated in all of the cultural customs and traditions in Mexico."[146] The petitioner testified that they had celebrated Children's Day "together, yes, in the past," and cited a text message from the respondent dated April 29, 2021, in which the respondent reminded him that "tomorrow it's Children's Day."[147] On cross-examination the petitioner insisted that he hadn't stated that N.D.N participated in Children's Day in Mexico.[148] He also clarified that N.D.N. made him something on Father's Day "so, you know, without looking at specifics, there were a bunch of activities we did with family in Mexico."[149]

The petitioner appeared to suggest throughout his testimony that the respondent was working or seeking work in Mexico. He said that the respondent wanted to attend a beauty school in Mazatlán;[150] the respondent said that she was tired of not doing anything and not having any money.[151] The petitioner claimed that the respondent operated an online site called Fashion Room Mazatlán associated with a bank account in Mexico.[152] The respondent

---

[145] Tr. 5/2/24 at pp. 100, 102.
[146] Dkt. No. 77 at ¶17m.
[147] Tr. 4/29/24 at p.125.
[148] Tr. 4/30/24 at p. 61.
[149] Id. at p. 83.
[150] Tr. 4/290/24 at p. 127.
[151] Tr. 5/2/24 at p. 71.
[152] Tr. 4/29/24 at pp. 93-96; Ex. 28

testified that Fashion Room Mazatlán is not a business but an online web page where several people can list articles for sale.[153] The respondent explained that she managed the account through Instagram and gave the money to her mom who would make the deliveries.[154]

Finally, the petitioner claimed that the respondent was a real estate agent for a company in Mexico.[155] He testified that she asked if he knew any investors who would buy properties from her.[156] The respondent, however, testified that she did not work for a real estate company in Mexico and has never worked as an agent or for an agency.[157] She explained that she accompanied a friend to a formal three-day real estate course in Mexico after her friend said she would pay a commission if the respondent showed the petitioner a house.[158] The respondent mentioned that the petitioner should buy the home next door with a pool because the petitioner had been given some money and wanted to invest it.[159] The respondent testified that she sent pictures of homes to the petitioner, but that the petitioner never purchased a home and she never got paid a commission.[160]

The parties stipulated that N.D.N. did not have health insurance coverage while in Mexico between April and August 2021.[161] The parties also

---

[153] Tr. 4/30/24 at p. 122.
[154] Id. at p. 123.
[155] Tr. 4/29/24 at p. 137.
[156] Id.
[157] Tr. 5/2/24 at p. 74.
[158] Id.
[159] Tr. 5/2/24 at p. 71-72.
[160] Id. at p. 75.
[161] Dkt. No. 82 at ¶14.

stipulated that N.D.N. received medical care relating to his autism spectrum disorder diagnoses (ASD) from two doctors in Mexico: Dr. Moran Osuna and Dr. Camacho Vazuez.[162] The respondent testified that she did not arrange for medical files to be transferred to Mexico.[163] She also testified that there were no necessary medical appointments to schedule in the United States between April and August 2021.[164]

With regard to the respondent's United States citizenship, the petitioner testified that he understood the respondent had dropped the immigration process before moving to Mexico and that she told him to "forget about the papers."[165] He testified that he interpreted a text message from the respondent on February 21, 2021 to mean that the immigration attorneys were going to withdraw from the case because the respondent hadn't communicated with them.[166] He also said that the couple both were tired of their acrimonious relationship and that by March 11, 2021, the respondent sent a text that she would sign "a letter with your lawyer" because "both of us are already very tired and exhausted with this stormy relationship."[167] The petitioner testified that he became "very concerned about the legality" of the immigration proceedings and communicated to the lawyers that he didn't want to be involved in the process.[168] The petitioner asserted that he had no knowledge or understanding

---

[162] Id. at ¶15.
[163] Tr. 5/3/24 at p. 81.
[164] Id.
[165] Tr. 4/29/24 at p. 104.
[166] Id. at p. 102-104, Ex. 81, p. 160.
[167] Tr. 4/29/24 at p. 105-09.
[168] Id. at p. 151.

that the respondent would continue to participate in the permanent residence

application in the United States.[169]

The petitioner went on to suggest that the respondent was the reason

that their relationship fell apart. He introduced evidence that, around May 14,

2021, the respondent sent the following email to the petitioner:

> This is very difficult for me. Me ego, my pride tells me that I am humiliating myself. Just as I did on previous occasions, crying to you, begging you to forgive me, but this time it is different because there is no turning back.
>
> Even so, I write this with all my heart and with pain I say to you: for the thousandth/000th time I am sorry, I know I failed you, I failed my children, your children (all of them), I apologize to them too, Aden and Isael.
>
> I'm not asking you to forget, but please let it go. I was wrong, I acted wrong and you don't deserve it, I am a thousand percent sure that you are the man I have loved the most, so much that I didn't know how to handle the fear of losing you  . . . .[170]

The petitioner testified that, through this email, the respondent was

recognizing "all the harm and damage abuse she had committed against all of

[them] through the years."[171] When she was asked about this email, the

respondent testified that "sometimes you say stupid things," that she didn't

have any self-esteem and that the petitioner told her that nobody who knew

her past would want her.[172]

The respondent testified to a completely different version of the events

with respect to her immigration status. The respondent said that she and the

---

[169] Id. at p. 107.
[170] Ex. 84.
[171] Tr. 4/29/24 at p. 130.
[172] Tr. 5/2/24 at pp. 76, 77.

Case 2:22-cv-01224-PP   Filed 06/13/24   Page 30 of 69   Document 90

petitioner had been having arguments in 2021 after she received pictures of the person with whom the petitioner currently lives.[173] The respondent told the petitioner to "forget about us pretend we didn't exist in your life. [N.D.N.] will be perfect with me Keep walking like a macho from pussy to pussy."[174] Even so, the respondent testified that the petitioner told her she had nothing to worry about with the immigration papers.[175] She testified that they had submitted an application online for a Social Security number in early 2021 because immigration needed the number for a permanent green card.[176] She emphasized that she had applied for the Social Security number because they were going to live in the United States: the idea was not to remain in Mexico but only to go there on vacation.[177] She knew that as a permanent resident she could not be outside of the United States for more than six months.[178]

The respondent admitted on cross-examination that the couple did not have a planned reentry date, but she said she thought it would probably be at the beginning of August.[179] She said that the petitioner had told her that it would be easier to travel from Texas to the business in Sinaloa.[180] She admitted that they had not agreed on leases in Texas, which the respondent says is when the arguments "started to get harder."[181] According to the

---

[173] Id. at p. 63.
[174] Ex. 81 at p. 220.
[175] Tr. 5/2/24 at p. 78-79.
[176] Id. at p. 56.
[177] Tr. 5/2/24 at p. 56.
[178] Id.
[179] Tr. 5/2/24 at p. 57.
[180] Id. at p. 59.
[181] Id. at p. 58.

respondent, she asked the petitioner "is that what you brought me here for so I could notice all of the shit that you do, and he told me you're not going to return."[182]

The respondent testified that she called her immigration attorneys in May of 2021.[183] She then learned that the petitioner had concealed from her that her immigration status had lapsed and that he had told the immigration attorney in February that they were getting divorced.[184] The respondent testified that the petitioner continued to tell her that everything was still in process but she knew that was not true.[185] The respondent said that in May of 2021, she contracted with a lawyer to help her with her immigration status.[186] The respondent testified that in May of 2021 she prepared a statement "as to what happened;" the statement was filed with immigration sometime before August 2021.[187] The respondent did not tell the petitioner what she was doing with respect to immigration because he had "cancelled her papers" and she didn't think it would make a difference to him at all.[188] She testified that she didn't return to the United States immediately because she needed time to think and to figure out what to do.[189] She said that she depended on the petitioner financially so she continued to act as if everything was normal.[190]

---

[182] Id.
[183] Id. at p. 77-78.
[184] Id. at p. 78.
[185] Id. at p. 79; Tr. 5/3/24 at p. 51.
[186] Tr. 5/2/24 at pp. 80-81.
[187] Id. at p. 81.
[188] Tr. 5/2/24 at p. 82.
[189] Id. at p. 82-83.
[190] Id. at p. 85-86.

The respondent decided to return to Racine rather than Texas because it was a place that she knew where she could navigate her surroundings.[191] She contacted a friend in Racine who told her to come and that she could stay at the friend's house while she got things organized.[192] The respondent said that she continued to take N.D.N. to therapy because she did not want him "to miss a single day of anything that he could retain."[193] She admitted that she made the  plan—by herself—to move to the United States once she discovered by May 15, 2021 that the petitioner had lied to her about travelling to Mexico and that he had made his own plans to take her to Mexico "with lies, by lying."[194]

The parties stipulated to the fact that the respondent did not inform the petitioner that she was leaving Mexico with N.D.N. around August 14, 2021.[195] They also stipulated that the petitioner never consented to the respondent and N.D.N.'s travel and did not acquiesce to the minor child remaining in the United States.[196] The petitioner began texting the respondent almost immediately and threatened her with a kidnapping lawsuit.[197] On September 2, 2023 the petitioner filed with the prosecutor general of the South Zone Vice Prosecutor's Office in Sinaloa, Mexico a formal complaint for criminal abduction of a minor charges against the respondent in relation to their minor

---

[191] Id. at p. 83.
[192] Id. at p. 83-84.
[193] Id. at p. 85.
[194] Tr. 5/3/24 at pp. 47.
[195] Dkt. No. 82 at ¶18.
[196] Id. at ¶19.
[197] Ex. 81 at p. 749.

child.[198] On or around September 8, 2021, after the respondent left Mexico with their minor child, the petitioner filed in Mexico for dissolution of their marriage.[199]

The petitioner did not testify that the respondent had communicated to him that she would return to live in Mexico. However, the petitioner was asked about a transcript of a December 2021 voicemail (translated into English) in which the respondent told her brother that she would "go in December" and "see that the child is super happy," "and let the child live with him, as long as he allows the child to continue going to therapy, recognizes that the child has a condition, then I will stay, with pleasure and cancel my papers and even Omar's[200] . . . ."[201] The petitioner testified that it was his understanding that this voicemail was "done early December."[202] The petitioner stated that he believed his attorney filed a pleading in the state court case on March 22, 2022 for the return of the child pursuant to the Hague Convention and that that court issued an order on August 18, 2022 refusing to enter an order with respect to the Hague Convention.[203] The decision from the Racine County Circuit Court states, in a footnote, that the parties agreed that the Hague Abduction Convention was not an issue to be addressed by the state court.[204]

---

[198] Dkt. No. 82 at ¶17.
[199] Id. at ¶19.
[200] The respondent's oldest son from a prior relationship.
[201] Ex. 260: Tr. 4/29/24 at p. 165.
[202] Tr. 4/29/24 at p. 164.
[203] Tr. 4/29/24 at pp. 168-69.
[204] Dkt. No. 1-4 at 6, n.6..

34

The respondent stayed at a shelter for women and children in Kenosha. Olympia Garcia testified that she has rented an apartment located at 1237 South Memorial Drive in Racine, Wisconsin, to the respondent since August 2021.[205] Garcia testified that she was present when the respondent moved into the lower unit of the duplex and that someone from the church gifted the respondent a bed.[206] Garcia lives next door in a separate building.[207] Garcia sees the respondent and N.D.N. at the residence and says that the respondent is always with her son.[208] Garcia testified that the respondent has always paid her rent on time (except for the first month).[209]

The respondent called her sister, Maria de Jesus Palaomares Vargas, to testify.[210] Vargas testified that the respondent was living in Mexico City when she met the petitioner, and that the respondent's oldest son lived with the respondent's mother while the respondent was working in Mexico City.[211] Vargas testified that neither the petitioner nor the respondent talked about moving to Mexico permanently.[212] When the petitioner and respondent came to Mazatlán, the respondent told Vargas that they were going on vacation.[213] Vargas said that the respondent's vacations never lasted long but the

---

[205] Tr. 5/1/24 at pp. 63-64.
[206] Id. at p. 65.
[207] Id.
[208] Id. at pp. 67-68.
[209] Id. at p. 68.
[210] Id. at p. 81.
[211] Id. at pp. 81-82.
[212] Tr. 5/1/24 at pp. 87-88.
[213] Id. at p. 111.

Case 2:22-cv-01224-PP   Filed 06/13/24   Page 35 of 69   Document 90

respondent didn't tell her how long she would be staying.[214] Vargas said that she last saw N.D.N. in Mexico in 2021—before that she saw N.D.N. in Mexico in 2018.[215]

Vargas testified that one of the "toughest" fights between the petitioner and respondent occurred in Mexico in 2018 when the police were called to the home where they were staying.[216] Vargas saw the respondent bruised and crying, and her hair was disheveled.[217] According to Vargas, the respondent was crying and desperate because the petitioner was not allowing her back in the home.[218] Vargas testified that the respondent described to the police how the petitioner had "brought" the respondent down the stairs by her hair and hit the respondent.[219] Vargas said that the petitioner appeared aggressive when she saw him and that he argued with the police.[220] The petitioner remained inside the house with N.D.N. and the other children; the respondent was outside the house.[221] Vargas testified that the police stayed for "quite some time" until the petitioner calmed down.[222]

After 2018, Vargas didn't see the respondent again until 2021. Vargas said that she did not know N.D.N. to have friends in Mexico other than the two

_____

[214] Id. at pp. 119-20.
[215] Id. at pp. 102-03.
[216] Id. at pp. 106-07.
[217] Id. at p. 108.
[218] Id.
[219] Id. at p. 108.
[220] Id. at pp. 108-09.
[221] Tr. 5/1/24 at p. 109.
[222] Id. at p. 110.

36

times that he played with Vargas's children.[223] To her knowledge, the respondent did not work or sell property while in Mexico.[224] Vargas does not know that N.D.N. participated in any cultural events and thinks she saw the petitioner with N.D.N. on one occasion.[225] The petitioner did not come to any family events in 2021.[226] Finally, Vargas did not know N.D.N. to have any interactions with the community in Mexico in 2021.[227]

## VI. Conclusions of Law

The Hague Convention, to which both the United States and Mexico are signatories,[228] is designed "to address the problem of international child abductions during domestic disputes." Monasky v. Taglieri, 140 S. Ct. 719, 723 (2020) (internal quotation marks and citation omitted). The Convention "ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which [he] habitually resides," with certain exceptions. Id. "The Convention's return requirement is a 'provisional' remedy that fixes the forum for custody proceedings." Id. (citation omitted). In the United States, the Hague Convention is implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §9001 et seq. "Article 12 of the Convention states the general rule that when a court receives a petition for

---

[223] Id. at p. 115.
[224] Id. at pp. 115-16.
[225] Id. at pp. 112-13, 115.
[226] Id. at p. 113.
[227] Id. at p. 116.
[228] https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/International-Parental-Child-Abduction-Country-Information/Mexico.html.

37

return within one year after the child's wrongful removal, the court 'shall order the return of the child forthwith.'" Lozano v. Montoya Alvarez, 572 U.S. 1, 5 (2014) (citing Abbott v. Abbott, 560 U.S. 1, 9 (2010)). If the court receives a petition after "the expiration of the period of one year [from the date of the wrongful removal]," the court must order the return of the child "'unless it is demonstrated that the child is now settled in its new environment.'" Id.

Under the ICARA, a petitioner files a civil action in the court which is authorized to exercise jurisdiction in the place where the child is located at the time the petition is filed. 22 U.S.C. §9003(b). The petitioner has the burden of proving by a preponderance of the evidence the elements of a *prima facie* case for return. 22 U.S.C. §9003(e)(1)(A). The Seventh Circuit Court of Appeals has articulated a four-factor inquiry for determining whether a petitioner has stated a *prima facie* case: (1) when did the removal or retention occur? (2) where was the child's habitual residence prior to removal or retention? (3) was the removal or retention in breach of the custody rights of the petitioning parent under the laws of the State of the child's habitual residence? and (4) was the petitioning parent exercising those rights at the time of unlawful removal or retention? Baz v. Patterson, Case No. 23-3407, 2024 WL 1879035, *6 (7th Cir. Apr. 30, 2024). The U.S. Supreme Court has clarified that the custody rights must relate to a child under the age of sixteen. See Abbott v. Abbott, 560 U.S. 1, 9 (2010).

A.     When did the removal or retention occur?

As explained above, the petitioner filed his petition with this court on October 18, 2022. Dkt. No. 1. To benefit from Article 12's—for lack of a better

38

word—"presumption" of return, the unlawful removal would have had to take place on or after October 18, 2021 (the year prior to the filing of the petition).

In his opening statement, the petitioner's attorney argued that this was a wrongful retention case and that the petitioner was under the impression that "between August 14th, 2021, and December of 2021, [the respondent] and the minor child were going to come back [to Mexico]."[229] The petitioner's own pleading and evidence undermine that assertion. The petitioner pled this as a wrongful removal case, alleging that the respondent wrongfully removed N.D.N. from Mexico on August 14, 2021. Dkt. No. 1 at ¶17.[230] The parties stipulated that the respondent did not receive the petitioner's consent to leave Mexico with N.D.N. and travel to the United States on August 14, 2021, and that the petitioner never agreed to allow N.D.N. to remain in the United States with the respondent.[231] The respondent testified that she never communicated to the petitioner that she would return to live in Mexico.

The petitioner introduced evidence of a text exchange between the petitioner and the respondent on August 18, 2021 in which the respondent told the petitioner that she left and took everything.[232] The petitioner asked the respondent when she was coming back and she told him that she was not

---

[229] Tr. 4/29/24 at p. 10.
[230] At points in the petition, the petitioner used the word "retained," but used it in the context of removal. For example, in paragraph 1 of the petition, he stated that the minor child was "wrongfully retained in the United States of America from Mexico by the child's mother without the Petitioner's knowledge or consent on or about August 14, 2021." Dkt. No. 1 at ¶1.
[231] Dkt. No. 82 at ¶19.
[232] Ex. 81 at p. 747.

returning.[233] The petitioner then threatened to file a "kidnapping lawsuit in the USA" and to send for his son.[234] The petitioner demanded the respondent's lawyer's number, ordered the respondent to have the lawyers call and said he didn't think they'd solve anything.[235] The respondent reminded the petitioner that he had canceled her papers and had told her that she wouldn't be able to come back.[236] Nothing about that conversation gave the petitioner a basis for believing that the respondent was returning to Mexico with N.D.N.

On these facts, on May 1, 2024—the third day of the evidentiary hearing—this court found that the respondent had removed N.D.N. to the United States without the petitioner's consent on August 14, 2021.[237] The court found that on August 18, 2021, the respondent had informed the petitioner that she had left and was not returning.

The petitioner's actions following that text exchange confirm that he believed that the respondent was not returning to Mexico. Once the petitioner knew that the respondent had left Mexico in August of 2021, he immediately started filing complaints against the respondent in different venues, and he continuously has maintained that the removal of N.D.N. was a crime of domestic violence in Mexico. On September 2, 2021, the petitioner filed a complaint requesting criminal charges against the respondent in the Mexican court. On September 8, 2021, the petitioner filed his divorce proceeding in

---

[233] Id. at p. 749.
[234] Ex. 81 at p. 749.
[235] Id. at p. 750.
[236] Id.
[237] Tr. 5/1/24 a p. 28.

Mexico. The petitioner also testified that he had some contact with the State Department to understand the process for return. The evidence shows that the petitioner began pursuing the return of N.D.N. in mid-August 2021—immediately after learning that the respondent had left Mexico and taken N.D.N.

During the evidentiary hearing, the petitioner's attorney argued that this is a retention case because the respondent was "manifesting communications to whomever [would] listen" about returning in December.[238] This argument is not supported by credible evidence in the record. As explained by the Seventh Circuit, "[w]rongful retentions typically occur when a parent takes a child abroad promising to return with the child and then reneges on that promise." Redmond v. Redmond, 724 F.3d 738 n.5 (7th Cir. 2013). This is not that case. The respondent did not tell the petitioner that she was taking N.D.N. to the United States before taking him. She did not tell the petitioner that she would return N.D.N. to Mexico by a certain date. This is not a case where the respondent led the petitioner to believe that she was taking N.D.N. to the United States for a brief vacation or holiday, with a set return date, and then reneged. The respondent made no promise—or *any* communication—to the petitioner that she would return with N.D.N. to Mexico to live on a permanent basis. Shortly after she left Mexico, the respondent texted the petitioner a photo of N.D.N. on the airplane and told the petitioner that she was in the

---

[238] Tr. 5/3/24 at p. 97.

United States.[239] He responded with "What mother fucker are you talking about?"[240] He then said he was "going to file a kidnapping lawsuit in the USA."[241] He immediately started filing complaints and legal proceedings in Mexico.[242] The respondent testified that when she came to the United States in August of 2021, the petitioner locked her out of her phone and was threatening the person with whom she was staying in Wisconsin.[243] (The petitioner's attorney suggested that the petitioner was panicking as "any normal, reasonable parent would."[244]) The evidence shows that the petitioner understood as of mid-August 2021 that the respondent had taken N.D.N. to the United States and was not planning to return.

The petitioner's attorney argued that the respondent had communicated to "people including [the petitioner]" her intent to return to Mexico with N.D.N.[245] The only evidence of this was the petitioner's testimony about a voicemail that the respondent had left her brother sometime in early December of 2021.[246] The petitioner did not explain when he learned of the voicemail. In the English transcript of the voicemail (the recording is not in the record because it wasn't properly disclosed), the respondent said that she would go to Mexico in December and that, if she saw that the petitioner was allowing

---

[239] Ex. 81 at p. 747.
[240] Id.
[241] Id.
[242] Dkt. No. 82 at ¶¶17, 19.
[243] Tr. 5/3/24 at p. 25; Ex. 224.
[244] Id. at p. 96.
[245] Id. at p. 97.
[246] Tr. 4/29/24 at pp. 152-64.

42

N.D.N. to participate in therapy, if the petitioner acknowledged that N.D.N. had a condition and if the respondent saw that N.D.N. was happy, she would stay. The respondent did not leave this voicemail for the *petitioner*, and she did not say in the voicemail that she intended to return to Mexico with N.D.N. to live permanently. The petitioner presented no testimony of anything the respondent said to *him* between August and December that gave him the impression that she would return to live in Mexico or that there was a date by which she would return.

The petitioner's own words and actions establish that he knew that the respondent had left Mexico with N.D.N. in August of 2021 (as he confirmed in the August 18, 2021 text that he sent to the respondent). He filed his petition with this court on October 18, 2022—one year, two months and four days after the unlawful removal.

The petitioner argued to this court that even if the date of unlawful removal was August 14, 2021, his October 2022 petition was timely filed because he filed an application under the Hague Convention in Mexico which was forwarded to the United States Department of State in August of 2022. He also argued that the "commencement of the proceedings was done in March before the state court of Wisconsin."[247] He suggested that the filing of the application tolled the time for filing his petition with this court.

There is no clear evidence in this record that the petitioner filed an application in Mexico or that the petitioner communicated with the U.S. State

---

[247] Tr. 5/2/24 at p. 5.

Department, and there are no exhibits that support that argument. The petitioner testified about communicating with the State Department but did not provide a time frame. With respect to his filing in the respondent's Racine County divorce case, the "pleading" upon which he relies was a motion to dismiss the respondent's petition for legal separation. The parties agreed in that case that the Hague Convention issue was not properly before the Racine County Circuit Court, the court declined to rule on any arguments under the Hague Convention and the state court stayed the litigation in Wisconsin.

In any event, the United States Supreme Court has rejected the petitioner's tolling argument. In <u>Lozano</u>, 572 U.S. at 11, the Supreme Court unequivocally decided that equitable tolling did not apply to the one-year period for seeking return of an abducted child. The Court reasoned that the one-year period is not a statute of limitation. <u>Id.</u> at 15-16. It concluded that the one-year period simply opens the door to consideration of a third party's interests (the child's interest in being well-settled in his new environment).

The evidence shows, and this court has concluded, that August 14, 2021 was the date of unlawful removal and that the petitioner did not file his petition within one year of that date. That conclusion, however, has no impact on whether the petitioner has proven his *prima facie* case. It only opens the door to the respondent's well-settled defense in the event that the court determines that the petitioner has made a *prima facie* case.

B.    Was the child removed or retained from his or her habitual residence?

The parties presented competing evidence on the issue of habitual residence. The petitioner argues that the parties intended to move to Mexico in April of 2021 and that Mexico became N.D.N.'s place of habitual residence during the four months that they were there (from April to August 2021). The respondent asserts that the child's place of habitual residence is the United States, where N.D.N. was born and raised. The respondent testified that she was deceived by the petitioner, who controlled all financial decisions and who led her to believe they were relocating to Texas with a stopover in Mexico to save money before Texas schools reopened.

The United States Supreme Court has made clear that the question of whether a child's residence is "habitual" is a fact-sensitive inquiry rather than a categorical one. Monasky v. Taglieri, 589 U.S. 68, 77 (2020). The Court explained:

> Because locating a child's home is a fact-driven inquiry, courts must be "sensitive to the unique circumstances of the case and informed by common sense." *Redmond*, 724 F.3d at 744. For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant. Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations. No single fact, however, is dispositive across all cases. Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. But suppose, for instance, that an infant lived in a country only because a caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus. See *Karkkainen*, 445 F.3d at 291 ("The inquiry into a child'' habitual residence is a fact-intensive determination that cannot be

45

reduced to a predetermined formula and necessarily varies with the circumstances of each case.").

Id. at 78.

Prior to April of 2021, the analysis would have been straightforward. The petitioner was born on September 28, 2016 in Kenosha, Wisconsin. At the time the petitioner and respondent traveled to Mexico in April 2021, N.D.N. was four and a half years old. He had spent his entire life in Racine, Wisconsin, traveling to Mexico only for vacation with one or both parents. If the court considers "the family and social environment in which [the child's] life has developed," Monasky, 589 U.S. at 77, N.D.N. lived in Racine with extended family nearby, saw other children in the day care that he attended daily (at least until COVID shut down all businesses and schools), and attended church and other gatherings with his family. N.D.N. has been treated by the same Wisconsin pediatrician since birth. After the respondent began to have concerns around the age of two that N.D.N. was exhibiting developmental delays, N.D.N. received services in-home from Wisconsin's Birth-to-Three program to try to address those delays.

Against this backdrop, the petitioner had the burden of persuading this court, by a preponderance of the evidence, that N.D.N.'s habitual residence was Mexico. Most of the petitioner's testimony and evidence focused on his insistence that he and the respondent shared an intent to relocate to Mexico. He testified that they packed up their home in Racine, that they drove a packed trailer to Mexico and that the petitioner and his brother dropped the

46

respondent and N.D.N. at a rental home in Mazatlán while he moved into their property sixty miles away with his other children.

The problem with the petitioner's shared intent argument is twofold. First, the Supreme Court has ruled that the "determination of a habitual residence does not turn on the existence of an actual agreement." Id. at 76. Second, the evidence in the record does not support a finding of shared or settled intent (or agreement) for the parties to permanently move to Mexico. Nor does the evidence establish a shared or settled intent to abandon a residence in the United States. Aside from petitioner's own testimony that he and the respondent purposefully crossed the border before the respondent's pregnancy began to show so that N.D.N. would be a U.S. citizen, the evidence shows that the petitioner, the respondent and N.D.N. lived in the United States from N.D.N.'s birth in September 2016 until the petitioner sold their property in April of 2021. The parties do not dispute that at some point prior to their traveling to Mexico in April 2021, the petitioner had filed paperwork to obtain a green card for the respondent. The petitioner admits that shortly before the parties left Racine, Wisconsin, they applied for a Social Security number for the respondent so that she could get her green card.

In a footnote, the Supreme Court in Monasky explained that courts have considered other factors, such as "a change in geography combined with the passage of an appreciable period of time," "age of the child," "immigration status of child and parent," "academic activities," "social engagements," "participation in sports programs and excursions," "meaningful connections

47

with the people and places in the child's new country," "language proficiency" and "location of personal belongings." Id. at 78, n. 3 (citing Federal Judicial Center, J. Garbolino, THE 1980 HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION: A GUIDE FOR JUDGES 67–68 (2d ed. 2015)). That list has been updated to include "the circumstances of caregiving parents with infants or young children," "indefinite residence in only one place," "the degree of the child's acclimatization to the new environment," "participation in religious activities," "parental intent," "the period of time that the child was physically located in a particular place," "personal issues, such as medical care and schooling,' and "previous stays in other countries." Federal Judicial Center, J. Garbolino, THE 1980 HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION: A GUIDE FOR JUDGES 76-77 (3d ed. 2023).

The competing testimony of the parties on virtually every aspect of this fact-specific inquiry required the court to make credibility determinations. Some aspects of the petitioner's testimony were credible. The petitioner established that he was born in the United States and that he wanted to cross the border from Mexico into the United States before the respondent's pregnancy was showing so that his son would be born in this country. The petitioner started a company in Wisconsin with the intent of eventually starting a company in Mexico. The court accepts that the petitioner intended to move to Mexico at some point (although his testimony as to when was not consistent; he mentioned more than one date between 2016 and 2021), that the petitioner

48

spent significant time in Mexico and that the petitioner controlled all financial decisions in the couple's relationship.

Also credible, however, were aspects of the respondent's testimony, which directly contradicts the petitioner's in several respects. The court found credible the respondent's testimony that she had nothing to do with the petitioner's business in Mexico and had no knowledge of the petitioner's intentions to relocate anywhere prior to 2020. Their relationship, which began as a business transaction, became something more to the respondent. She believed it had become romantic prior to the birth of their son. She believed that they were going to live in the United States. She testified about the petitioner filing paperwork to help her obtain her green card so that she could stay legally in the United States. She testified at length about how, beginning in 2020 after the petitioner received a large sum of money, the parties had discussed moving to Texas or Florida. She said that they decided on Texas, where the petitioner's brother lived, because of the business opportunities and the schools. The respondent testified that she agreed to Texas because it "sounded very nice." She said that the petitioner sent her links to homes in Texas that she thought they were going to purchase or rent. Shortly before they left Wisconsin, she was told that they were going to go directly to Mexico to save some money so that they could put down a bigger down payment on the house in Texas. She agreed to stop in Mexico because it had been a while since she had been there. She said they were going to stay in Mexico while the

Racine school classes were online and move to Texas when in-person classes resumed.

The court cannot conclude that the petitioner proved, by a preponderance of the evidence, that the parties both intended to move to Mexico. The petitioner proved by a preponderance that *he* intended to move to Mexico, but the respondent's testimony that she did not intend to move to Mexico was credible. On this factor, the petitioner failed to prove by a preponderance that Mexico was N.D.N.'s habitual residence.

Even if the petitioner had proved by a preponderance of the evidence that both parties intended to move permanently to Mexico, as the court has explained, the parents' intent is only one of many factors the court must consider. The petitioner argued that the court should give more weight to the intent of the parties because their child is not able to acclimatize to his surroundings. The record shows that N.D.N. has been diagnosed with autism spectrum disorder, level III, requiring significant levels of care for his developmental, cognitive, speech and social delays. In Monasky, the Supreme Court said that if the child is old enough to acclimatize to his surroundings, "facts indicating acclimatization will be highly relevant." Monasky, 589 U.S. at 78. For children who depend on their parents as caregivers, however, the "intentions and circumstances of caregiving parents are relevant considerations." Id. In considering the intentions and circumstances of the caregiving parents, the court must look to the respondent, with whom N.D.N. spent virtually all of his time in Mexico (and, some of the record evidence

50

reflects, in the United States, as well). N.D.N. was nonverbal at the time of removal, requiring constant supervision and even diaper changes; the respondent testified that N.D.N. was one hundred percent dependent her.[248] The unrefuted testimony was that the respondent was responsible for taking N.D.N. to and from therapy and medical appointments and for attending to his daily needs. At best, the petitioner introduced four exhibits showing that he had inquired of the speech therapist about N.D.N. through an app used by the speech therapist.[249] Again, looking at the intentions and circumstances of the respondent, the evidence supports the conclusion that the United States, not Mexico, was N.D.N.'s habitual residence.

With respect to the other factors mentioned by Monasky and other courts, the court finds that although there was a change in geography, it was for a relatively short period and in a temporary fashion. The parties do not dispute that upon their arrival in Mexico, the petitioner dropped the respondent and N.D.N. off at a rented apartment in Mazatlan, while the petitioner moved into the home the respondent owned in Escuinapa, an hour away. The respondent testified that she began making plans to return to the United States on her own in May (a month after arriving in Mexico), once she learned from the immigration attorney that the petitioner had canceled "her papers" and planned to divorce her as early as February. Despite the petitioner's representations and testimony to the contrary, the evidence did not

---

[248] Tr. 5/2/24 at pp. 97-98, 102.
[249] Exs. 15-18.

show by a preponderance that the respondent had jobs in Mexico—she maintained a website and took a three-day real-estate course. At the time of removal in August 2021, N.D.N. was almost five years old but had not been in a school environment (either in the U.S. or Mexico) because of COVID and he did not participate in sports programs. He was in speech therapy in Mexico because the respondent didn't want him to lose ground on any progress he'd made developmentally, but even that ended because of COVID. When the respondent texted the petitioner to say that she was back in the United States, she told him she took everything but the bed.[250]

The petitioner argued—but failed to establish by a preponderance—that N.D.N. made "meaningful connections with the people and places" in Mexico. The petitioner asserted that N.D.N. attended family gatherings, said that N.D.N. took swimming classes and presented a text from the respondent showing a picture of N.D.N. with a "friend." The respondent clarified that N.D.N. had limited contacts with the petitioner and her family. N.D.N. saw his grandmother and grandfather twice while in Mexico.[251] Even Vargas testified that she rarely saw her sister. The respondent said that N.D.N. was not enrolled in swimming classes or any type of activity, but sometimes swam at the pool with a neighbor girl. While the petitioner represented to the court in his trial brief that he saw N.D.N. daily while in Mexico, his own testimony at the hearing refutes that statement. The petitioner lived sixty miles away and

---

[250] Ex. 81 at p. 747.
[251] Tr. 5/2/24 at p. 100.

testified that he saw N.D.N. every weekend or every other weekend. The respondent testified that the petitioner rarely saw N.D.N. and that N.D.N. sometimes refused to go with the petitioner when the petitioner would pick him up for "parenting time."

The court found other inconsistencies in the petitioner's testimony. For example, he testified that N.D.N. observed cultural events in Mexico, such as Children's Day and Father's Day, but later admitted that N.D.N. did not participate in any Children's Day activities in Mexico and simply made something for the petitioner on Father's Day (which is observed in both countries).[252] The petitioner testified that they had enrolled N.D.N. in school, but the evidence revealed that "school" consisted of a center where N.D.N. received speech therapy and a center for interventions based on his autism diagnosis. The speech therapy ended in July when the COVID numbers started to increase. The evaluation for the autism therapy, completed on July 8, 2021, stated that N.D.N. required substantial support, exhibited severe deficits in the ability to communicate socially and required continuous intervention. The respondent testified that the petitioner never attended therapy and never took N.D.N. to therapy or picked him up; there is no evidence to the contrary.

The petitioner focused on the immigration status of the child and parent. The petitioner is a citizen of the United States and a permanent resident of Mexico. N.D.N. is a citizen of the United States and Mexico. At the hearing, the parties attempted to digress to a dispute regarding whether one or the other

_____

[252] Tr. 4/29/24 at p. 125; Tr. 4/30/24 at pp. 61, 83.

had complied with the immigration and even the tax laws of the United States. The focus for this court is on N.D.N.'s habitual residence, not the parties' compliance with other federal laws. The petitioner testified that in 2016, the petitioner and respondent crossed the border from Mexico to the United States before the respondent's pregnancy was showing to live the United States and so that the child could be born a U.S. citizen. The petitioner admitted that they received the respondent's permanent resident card for the United States around the time the house in Escuinapa was completed.[253] The parties continued to pursue a green card for the respondent after that time. On February 12, 2021—two months before they left Racine—the petitioner texted the respondent, asking for a photo of her permanent resident card, which he needed for her Social Security application, as well as her parents' full names.[254] At that time, the petitioner told the respondent that a letter had come, extending her residency.[255] The petitioner and the respondent applied for the respondent's Social Security card shortly before they left.[256] Their steps to obtain a residency card support an intent to relocate in the United States.

While the petitioner claimed that the respondent told him to forget about the immigration process, other evidence contradicts that testimony. The respondent testified that she asked the petitioner about a letter she had received from immigration and he assured her that there was nothing to worry

---

[253] Tr. 4/30/24 at pp. 25, 27.
[254] Ex. 81 at pp. 135-36.
[255] Id.
[256] Id. at p. 44-47.

about. He admitted that he sent the respondent a text telling her he had filed for an extension, to calm down and that there was nothing to worry about.[257] On February 25, 2021, the petitioner told the respondent in a text that he had already sent all the information to Social Security.[258] Again on March 1, 2021, the petitioner told the respondent that he had sent the information requested by the Social Security Administration.[259] On March 1, 2021, the respondent texted the petitioner a picture of a Social Security card in which the Administration had switched the name Vargas Rodriguez and the petitioner said "have to call to have it fixed."[260] On March 11, 2021, the petitioner said they should see if the card had arrived (although at the hearing he testified that he didn't remember what card he was referring to).[261]

The respondent testified that her comment telling the petitioner to "forget about" the immigration process was a statement made in the heat of an argument. She testified that while they were in Mexico in the spring of 20201, the petitioner had told her that she would not be able to return to the United States, which prompted a phone call to her immigration attorney on May 17, 2021. She then learned that the petitioner had not informed her of a critical deadline and that she had missed it. She testified that the petitioner did not respond to her when she asked why he didn't forward the email to her with the

---

[257] Tr. 4/30/24 at p. 54, Ex. 81 at p. 161.
[258] Ex. 81 at p. 176.
[259] Tr. 4/30/24 at p. 55.
[260] Ex. 81 at p. 185.
[261] Tr. 4/30/24 at p. 58.

deadline.[262] She testified that the petitioner did not tell her that he didn't want to be involved.[263] He did not mention divorce at that time.[264] The parties stipulated to the fact that the respondent holds a valid permanent resident card for the United States[265] and she testified that she currently is working with an immigration lawyer to, among other things, resolve the issues resulting from the petitioner's failure to relay critical information. This evidence supports the respondent's assertions that, as the caregiving parent who was financially dependent on the petitioner, she had been coerced into remaining in Mexico.

The petitioner's attorney made much of the fact that the respondent never contacted schools in Texas, located doctors in Texas or discussed the move to Texas while with her husband in Mexico. This testimony, however, is consistent with the parties' testimony about their relationship. The testimony from both parties describes a relationship that began as a business arrangement, although at some point it became more romantic for the respondent. The respondent moved from Mexico to Wisconsin to be with the petitioner. The evidence shows that the petitioner exerted financial control in their relationship—from paying the respondent a sort of "allowance," to making purchases, to directing the respondent to make purchases—and he appears to have made all significant decisions. The court heard testimony about a domestic abuse incident in Mexico in 2018 while the petitioner and respondent

---

[262] Id. at p. 73.
[263] Id. at p. 75.
[264] Id. at p. 76.
[265] Dkt. No. 82 at ¶4.

were there for a short visit. The respondent's sister came to the scene after the police were called and described the incident in detail. This testimony supports at least an inference that the petitioner's control over the respondent was not solely financial. The relationship appears to have been volatile for quite some time prior to the 2021 trip to Mexico. Neither party described a relationship in which the two functioned as partners, discussing significant decisions and working through them together. Both described a relationship in which the petitioner made decisions and the respondent complied with them.

The testimony and the evidence corroborate the respondent's explanation that when she learned that the petitioner had stopped supporting (and perhaps sabotaged) her efforts to get a green card and that he intended to file for divorce (and possibly when she learned that he was seeing someone else), she did not consider taking N.D.N. to Texas. She decided to return to Racine because Racine was the only place with which she was familiar; she knew people there, and it was where she had doctors and a school for N.D.N. Even the doctor in Mexico had advised her to return to the United States where services were available to address N.D.N.'s need for a significant level of care.

Given the nature of the competing testimony on these key points and the inconsistencies between the petitioner's representations to the court and his testimony, the petitioner failed to establish by a preponderance of the evidence that Mexico became the place of habitual residence for N.D.N. during the four months between April and August of 2021. N.D.N.'s habitual residence was in the United States. He lived in Racine, Wisconsin with his mother and father

57

from his birth in 2016 until his parents left in April of 2021 to drive to Mexico. His family, other children he knew, daycare, church, doctors and therapists were in Racine. Regardless of the intent to move to Mexico or Texas, the petitioner failed to persuade this court that the totality of the circumstances tips the scales toward Mexico. N.D.N. did not form meaningful connections in Mexico. That he has blood relatives in Mexico does not make his one or two visits with them dispositive. He didn't participate in activities in Mexico, he did not attend "school" there (although he did attend therapy), there was no testimony that he attended church or was taken to religious activities in Mexico, he didn't engage in cultural celebrations or traditions in Mexico (beyond making a card for Father's Day). The court found the respondent's testimony that N.D.N. rarely left her home, that she attended to his significant daily needs, that navigated his medical appointments and that she got him to therapy to be credible.

C.  <u>Was the removal or retention in breach of the custody rights of the petitioning parent under the law of the State of the child's habitual residence?</u>

The third element of the *prima facie* case requires the petitioner to show by a preponderance of the evidence that the removal was a breach of the petitioner's custody rights under the law of the child's habitual residence immediately before the removal. Hague Convention, art. 3, T.I.A.S. No. 11670. The court has determined that N.D.N.'s habitual residence was in the United States. In returning N.D.N. to his habitual residence, the respondent did not

58

wrongfully remove him from his place of habitual residence and the petitioner has not made a *prima facie* case.

Even if the court had found that Mexico was N.D.N.'s habitual residence, the Hague Convention explains that custody rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the State." Id. In his opening statement at the evidentiary hearing, the petitioner's attorney argued that he would show the petitioner was "entitled to parenting time under Mexican law."[266] That prediction never came to pass. The petitioner presented no evidence about Mexican custody law, or custody law in the state of Sinaloa. He presented no evidence about *any* custody law. He never cited a judicial or administrative decision regarding custody rights that was in place immediately *before* the August 2021 removal. Nor did the parties stipulate to the custodial laws of Mexico or the Sinaloan state. During the evidentiary hearing, the petitioner's testimony focused entirely on what he called "parenting time" while he was in Mexico, not on legal custody rights.

After the petitioner had rested, the respondent made an oral Rule 52(c) motion in which she raised the petitioner's failure to present evidence of "custody rights." The petitioner responded with several arguments.

First, he argued that anything short of abandonment would qualify as exercising custody rights, emphasizing his testimony that he saw N.D.N every weekend or every other weekend in Mexico. That argument does not address

---

[266] Tr. 4/29/24 at p. 9.

the question of what "custody rights" the petitioner had under the law of Mexico/Sinaloa. It simply assumes that seeing one's child every weekend or every other weekend constitutes an exercise of whatever "custody rights" that person has.

Second, the petitioner argued that rulings by the Racine County Circuit Court and a Mexican court resolve this issue. In his closing statement, the petitioner's attorney argued that "[c]learly Mexico has already made the finding and the determination that the custody rights of parties should be determined in Mexico, and the United States court agrees."[267]

The Hague Convention does not resolve international custody disputes. Redmond, 724 F.3d at 739. The Convention does not "contain rules for resolving competing claims of jurisdiction in international custody struggles or procedures for obtaining recognition and enforcement of foreign judgments or orders governing child custody." Id. "The court's inquiry in a Hague petition is limited to the merits of the abduction claim; the Convention is not a vehicle for resolving competing jurisdictional or merits claims in the underlying custody dispute." Id. at 740. Because the Hague Convention is not a "jurisdiction-allocation or full-faith and-credit treaty," id. at 741, the petitioner cannot use a subsequently entered custody order to "oust federal jurisdiction over a case brought under the Convention." See Baz, 2024 WL 1878035, at *6. As the court explains below, the orders upon which the petitioner relies were subsequently entered.

---

[267] Tr. 5/3/24 at p. 94.

The parties were married but living separately during their stay in Mexico. On September 2, 2021—*after* the respondent left Mexico with N.D.N.— the petitioner filed a formal complaint with the prosecutor general of the South Zone Vice Prosecutor's Office in Sinaloa, Mexico for criminal abduction of a minor charges against the respondent Dkt. No. 82 at ¶18. On or around September 8, 2021—*after* the respondent left Mexico with N.D.N.—the petitioner also filed in a Mexican court for dissolution of the parties' marriage. Id. at ¶19. On October 15, 2021—*after* the respondent left Mexico with N.D.N.—the respondent filed for divorce in Racine County Circuit Court. In re Marriage of Rosa Albina Rodriguez Vargas and Jorge Isael Nolla, Case No. 21FA858 (Racine County Circuit Court).

At the evidentiary hearing, over the respondent's objection, the court allowed the petitioner to reopen his case in chief to move into evidence a transcript from an August 18, 2022 hearing in the Racine County Circuit Court divorce proceedings.[268] During that hearing, the Racine County Circuit Court judge invited Judge Zazueta Zazueta from Sinoloa, Mexico to participate by Zoom and conceded jurisdiction to Mexico. Racine County Circuit Court Judge Cafferty stated that "Mexico will take jurisdiction over this case." Ex. 242 at 4. Judge Zazueta Zazueta—a Mexican judge—then began to preside over the Racine Circuit Court proceeding, stating that "it's been shown that the father lived in and his business is in and the assets are in this jurisdiction. [N.D.N.] besides that has more support networks here in Sinaloa. To begin with, it has

---

[268] Tr. 5/1/24 at pp. 44-48; Ex. 252; Tr. 5/3/24 at p. 9.

been shown that mom and her family, [the respondent], do live here in Sinoloa." Id. at 7. Judge Zazueta Zazueta declared the removal of the child to be a "violation of actually domestic abuse here in Mexico." Id. at 8. Judge Zazueta Zazueta then stated:

> The decision Judge Cafferty and I have made is that he really should be here in Mexico first because jurisdiction is actually here in Mexico. Also, because [N.D.N.'s] support network is here in Mexico and also everything I have here in my file supports that the intention of the parents were in fact to live in Mexico. The divorce by [the petitioner] was filed first here in Mexico and [the petitioner] exhausted all means possible to him to deliver the rogatory letters. The mother also has family here in Mexico and that is why I say that she has a support network as well.

Id. at 8. Notwithstanding these statements, Judge Zazueta Zazueta clarified that he was deciding only jurisdiction and he appointed a public defender from Mexico for the respondent. Id. Judge Zazueta Zazueta gave the respondent—who said she did not have prior notice of the Racine Court's ruling—fifteen days to appear in Mexico. Id. at 11. Judge Cafferty added that she had "not made the decision that [N.D.N.] is best in Mexico." Id. at 13. She decided only that Mexico would make that decision. Id.

So, as of July 2022, the Mexican court believed that it had jurisdiction over the respondent but no court—in either Mexico or Wisconsin—had ruled on custody. At all times, the parties have disputed habitual residence. As the Seventh Circuit has explained, this court must resolve the antecedent question of habitual residence before any decision about what weight to give a custody order. Walker v. Walker, 701 F.3d 1110, 1116 (7th Cir. 2017).

The Walker case provides guidance regarding the impact of the ruling in the Racine County Circuit Court. In Walker, the father filed a petition under ICARA to compel his wife in Illinois to return their three children to Australia. Id. at 1114. The parties had traveled to the United States in 2010: the father testified that it was a temporary move while he built a new house in Australia , while the mother testified that it was a prelude to a more permanent move to the United States. Id. at 1114-15. The mother filed for divorce in Cook County, Illinois; the father filed a petition under the Hague Convention. Id. at 1115. The Seventh Circuit rejected the mother's argument that a custody order from the Cook County Circuit Court mooted the Hague petition, citing various other federal courts that had held that state court rulings or judgments on the issue of custody "do not deprive the federal courts of jurisdiction to rule on the merits of the petitions, either in the first instance or on appeal." Id. at 1116-17 (citing Yang v. Tsui, 416 F.3d 199, 201-04 (3d Cir.2005); Silverman v. Silverman, 338 F.3d 886, 894 (8th Cir. 2003); Holder v. Holder, 305 F.3d 854, 864-66 & 867-72 (9th Cir. 2002)). The Seventh Circuit reasoned that because the parties disputed habitual residence, the district court first must resolve that question to determine which country had the power to resolve the issue of custody. Id. at 1116. (In Walker, the Seventh Circuit found no evidence of shared mutual intent to relocate in the United States and noted that the children had not been in the United States long enough to make them habitual residents. Id.)

63

The Eight Circuit's holding in <u>Barzilay v. Barzilay</u>, 536 F.3d 844 (8th Cir. 2008), is another example of these principles in action. The <u>Barzilay</u> court held that the pendency of state court custody proceedings between divorced Israeli citizens, one of whom lived in the United States, did not support the district court's abstention under the <u>Younger</u> doctrine from any action in the case brought under the Hague Convention. The <u>Barzilay</u> court explained that "[a] case arising from a petition under the Hague Convention is not a custody proceeding;" rather, a "district court is to ascertain 'only whether the removal or retention of a child was 'wrongful' under the law of the child's 'habitual residence,' and if so, to order the return of the child to the place of the 'habitual residence' for the court there to decide the merits of the custody dispute.'" <u>Barzilay</u>, 536 F.3d at 847 (quoting <u>Shalit v. Coppe</u>, 182 F.3d 1124, 1127 (9th Cir. 1999)). In discussing the importance of the federal court deciding the Hague Convention issue before the state court determined custody, the <u>Barzilay</u> court stated:

> [G]iven that Sagi obtained a custody determination from an Israeli court and Tamar has obtained a custody determination from a state court in this country, the federal district court is uniquely situated to adjudicate the question of whether Israel or Missouri is the habitual residence of the Barzilay children and whether they were wrongfully removed from that residence. *See* [*Yang*, 416 F.3d at 204; 42 U.S.C. § 11601(b)(3)(B) (emphasizing "the need for uniform international interpretation of the Convention"). Although the state clearly has an important interest in child custody matters, that interest has not been considered to be a significant factor in terms of abstention where ICARA is involved. *See Yang*, 416 F.3d at 204 ("It would make the Hague Convention and ICARA meaningless if a federal court abstained in a Hague Convention Petition because child custody was being disputed in state court.").

<u>Id.</u> at 850.

The <u>Barzilay</u> court then discussed the parties' dispute regarding "whether the state court proceedings afforded Sagi an adequate opportunity to raise the Hague Convention issues." <u>Id.</u> The Barzilay court disagreed with the district court's determination that "a Hague petition had been litigated in the state court and that abstention was justified." <u>Id.</u> at 851. The Barzilay court described the state court proceedings as follows:

> It is the "petitioner [who] is free to choose between state or federal court." *Yang*, 416 F.3d at 203. Neither Tamar nor Sagi filed a Hague petition in state court. Tamar merely referenced the Hague Convention twice. In her motion to modify the divorce decree, Tamar stated that Sagi used the Israeli court system "to fraudulently procure a judgment giving Israel exclusive jurisdiction over the custody of the minor children ... in blatant defiance of ... the Hague Treaty on Child Abduction." She did not reference the terms of the Hague treaty or explain how Sagi's use of the Israeli court system implicated the treaty. In her motion for a temporary restraining order, Tamar argued that the Israeli judgment need not be respected because that court lacked subject matter jurisdiction and should have deferred to the Missouri court given its existing custody judgment and the habitual residence of the children. She also complained that Sagi's use of the Israeli court system "violated the spirit, if not the letter, of the Hague Convention."

> At no time did Tamar file a Hague petition in the Missouri court. She did not request the state court to make a habitual residence determination under the Hague Convention. The determination of a child's habitual residence presents mixed questions of law and fact and requires the analysis of many factors, including the settled purpose of the move to the new country from the child's perspective, parental intent regarding the move, the change in geography, the passage of time, and the acclimatization of the child to the new country. *See Silverman II*, 338 F.3d at 897–98; *Mozes* [*v. Mozes*], 239 F.3d [1067,] at 1071–81 [(9th Cir. 2001)]. She also did not allege or ask the state court to rule that Sagi had wrongfully removed the children to Israel or wrongfully retained them there. She referenced the Hague Convention only to further her argument for a temporary restraining order preventing the enforcement of the Israeli action.

> Sagi's special appearance in Missouri was for the "limited purpose of opposing [the state court's] jurisdiction." Like the father in

65

*Silverman I*, Sagi restricted his state court arguments to jurisdictional issues. He never raised the Hague Convention before the state court except to contest its exercise of jurisdiction, just as the father in *Silverman I* had done. *See* 267 F.3d at 792 ("[T]he Hague issues were raised in the state court only by way of support for his argument that the state court should not have ruled on the custody issue until the federal court resolved the Hague issues."). The record shows that throughout the state court proceedings Sagi emphasized the limited nature of his argument as being only jurisdictional. Sagi never engaged in an argument in the state court on the merits of the Hague Convention considerations—habitual residence and wrongful removal. Rather, he informed the state court that he intended to file a Hague petition in federal district court to litigate the merits of the Hague issues in that forum.

Id. at 851-52. The court held that "[b]ecause neither parent filed a Hague petition in state court, we conclude that the Hague Convention issues were not properly or fully raised in that proceeding." Id. at 852. It concluded that "[t]he parties did not litigate the merits of such issues, and any statement by the state court touching on an issue under the Hague Convention inquiry is not controlling." Id.

Based on the record before this court (which is limited), the court concludes that the petitioner did not file a Hague Convention petition in state court, that the parties did not litigate a Hague petition in the state court, that they did not fully litigate the merits of the Hague Convention issues in another court and any statement by another court "touching on an issue under the Hague Convention inquiry is not controlling." Id. at 852. The issue of custody rights has not been established by any court order in place immediately prior to the August 14, 2021 removal. Rather, the petitioner has sought legal orders in response to the removal in an effort to alter the *status quo* that existed prior to removal.

66

To be clear, the court did not need to reach this element because it already has found that N.D.N. was not wrongfully removed from his place of habitual residence. The court discusses this element only to explain that had the petitioner met his burden and proven by a preponderance of the evidence that N.D.N.'s habitual residence was Mexico, the court nonetheless would have found that he failed to cite any authority or produce any evidentiary support regarding his assertion that the removal violated his custody rights under the laws of Sinaloa, Mexico as they existed immediately before N.D.N.'s removal. See Hague Convention, art.3(a), T.I.A.S. No. 11670. At best, the petitioner could have pointed to record evidence of a marriage certificate and his stipulation that he filed for divorce after the removal. Any conclusion this court might draw about whether Mexican law vests custody rights in one parent or both, or about what those rights might be, would be speculation or assumption unsupported by any authority from the party who bears the burden of proof.

D.     Was the left-behind parent exercising those custody rights?

Had the petitioner proven by a preponderance of the evidence that Mexico was N.D.N.'s place of habitual residence and had he proffered "any relevant material or source" regarding custody rights immediately before the removal, see Baz, 2024 WL 1879035, at *10, the court would have been required to consider whether he was exercising those custody rights at the time of removal. As the court has recounted several times, the petitioner's trial brief stated that he saw N.D.N. on a daily basis while in Mexico in the spring of 2021. On direct examination, the petitioner testified that he saw N.D.N. every

67

weekend. On cross-examination, the petitioner testified that it may have been every other weekend. The respondent testified that the petitioner rarely saw N.D.N. Regardless of the inconsistency in the petitioner's testimony and the conflict between the petitioner's testimony and the respondent's, "the standard for finding that a parent was exercising his custody rights is a liberal one." <u>Baz</u>, 2024 WL 1879035, at *11. A person with valid custody rights "cannot fail to exercise those rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." <u>Id.</u> As the petitioner's attorney argued, the evidence—despite being inconsistent and conflicting—shows by a preponderance that under Seventh Circuit case law the petitioner did not abandon N.D.N..

       E.    <u>Was the child under the age of sixteen?</u>

There is no dispute that N.D.N. was under the age of sixteen. His birth certificate establishes that he was born on September 28, 2016.[269]

## VII. Conclusion

The petitioner did not file this federal Hague Convention petition within one year of the August 14, 2021 removal of N.D.N. from Mexico. That means that if the petitioner had proven his *prima facie* case by a preponderance of the evidence, the court would have been required to order that N.D.N. be returned to Mexico unless the respondent could prove that he was well-settled in his new environment (the United States).

---

[269] Ex. 11.

The petitioner has not proven his *prima facie* case of unlawful removal by a preponderance of the evidence. He has not established by a preponderance of the evidence that N.D.N.'s place of habitual residence was Mexico. Nor has he proven by a preponderance of the evidence what custody rights he had under Mexican/Sinaloan law. Because the petitioner failed to prove his *prima facie* case by a preponderance of the evidence, the court need not consider the respondent's well-settled or grave risk defenses.

The court **DENIES** petitioner Jorge Isael Nolla's petition for issuance of a show cause order and for return of the child to Mexico.

The court **ORDERS** that this case is **DISMISSED WITH PREJUDICE**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 13th day of June, 2024.

BY THE COURT:

HON. PAMELA PEPPER
**Chief United States District Judge**